IVERT KIRKIRT, JR.,

        Plaintiff,

v.                                      Case No.  5:08-cv-501-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.

_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 9 & 10.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

In November 2003, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of January 19, 2001. (R. 58-60, 66-67.) Plaintiff thereafter amended his alleged disability onset date to April 1, 2006. (R. 542.) Plaintiff's application was denied initially and upon reconsideration. (R. 44-49, 52-53, 62-65, 68-73.) Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 43.) The ALJ conducted Plaintiff's

administrative hearing on January 18, 2007. (R. 300, 508-37.) The ALJ issued a decision unfavorable to Plaintiff on May 23, 2007. (R. 297-311.) The Social Security Administration's Office of Hearings and Appeals reviewed the hearing decision at Plaintiff's request and remanded the matter back to an ALJ for further proceedings. (R. 321-24.) The ALJ conducted another administrative hearing on March 4, 2008. (R. 538-79.) The ALJ issued a decision unfavorable to Plaintiff on March 26, 2008. (R. 17-29.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied.  (R. 7-10.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[1] *See* 42 U.S.C. § 405(g).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401(1971); <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which

---

[3] Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, he is disabled.[11] Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

---

[10] 20 C.F.R. § 404.1520(c).

[11] Id. § 404.1520(d).

[12] Id. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was forty five (45) years old at the time of the ALJ's decision on March 26, 2008. (R. 58.) He has a high school education with some special education classes, and has previous work experience as a truck mechanic, corrections officer, and tire

---

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

[21] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

repairman. (R. 74-79, 90.) Plaintiff contends that he has been unable to work since April 1, 2006 due to depression, headaches, spine disorder, and arthritis. (R. 85, 542.) Plaintiff is insured for benefits through September 30, 2008. (R. 336.)

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, testimony from a medical expert as well as testimony from a vocational expert ("VE"), the ALJ determined that Plaintiff suffers from degenerative disc disease of the lumbar spine. (R. 23.) While this impairments is severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 24.) Specifically, the ALJ considered Sections 1.00 and 1.04 of the Listings of Impairments. (R. 124.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of light work with restrictions. (R. 24.) The ALJ limited Plaintiff to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing or walking with a cane for four hours in an eight hour work day; sitting for six hours in an eight hour work day with alternating sitting and standing to relieve discomfort; pushing and/or pulling with his lower extremities occasionally; no kneeling, crouching, crawling, or climbing; and no exposure to hazards such as machinery and heights. (R. 24.) As for mental impairments, the ALJ found that Plaintiff did not suffer from a severe mental impairment and that he has only mild restriction of activities of daily living; mild limitations in social functioning; mild difficulties in maintaining concentration,

persistence, and pace; and no episodes of decompensation. (R. 23.) After finding that Plaintiff could not perform his past relevant work, the ALJ consulted a vocational expert ("VE"). (R. 28.) Based on the VE's testimony, the ALJ found that Plaintiff was capable of performing work which exists in significant numbers in the national economy and, therefore, is not disabled. (R. 28-29.)

**Medical Evidence Concerning Plaintiff's Alleged Physical Impairments**

Plaintiff has a long history of chronic low back and neck pain attributable to a series of multiple injuries he has incurred over the years. In the early 1990s, he reportedly slipped on ice and injured his low back. He subsequently exacerbated this back condition while serving in the military. (R. 525.) His injuries were apparently severe enough to warrant surgery and so Plaintiff underwent lumbar fusion at the L5-S1 levels in 1995. (R. 119, 123-24.) After surgical intervention did not resolve his pain, he presented to Dr. DiSclafani, an orthopedic surgeon, for evaluation in 1999. (R. 119.) Dr. DiSclafani diagnosed Plaintiff with chronic progressive pain status post L5-S1 fusion and opined that his back problems were not surgically correctable. He referred Plaintiff to pain management for treatment of his pain. (R. 119.)

X-rays and an MRI of Plaintiff's lumbar spine were performed in July 1999 and revealed evidence of surgery at the L5-S1 level but no obvious disc herniation or protrusion, no spinal stenosis, and no nerve root clumping. (R. 123-24.)

In July 2000, Plaintiff injured his back once again in a jet ski accident. (R. 118.) In addition to his chronic low back pain, Plaintiff also complained of neck pain radiating into his left upper extremity. Dr. DiSclafani noted that, prior to this accident, Plaintiff had

been "doing very well" with his pain management. Examination revealed normal sensation and good strength in Plaintiff's upper extremities except for some mild weakness in his left bicep muscle. According to Dr. DiSclafani, an MRI of the cervical spine revealed no herniated discs. (R. 118.) Three months later, Plaintiff returned with increased complaints of severe neck pain with radiation into his left upper extremity and low back pain with radiation into his left lower extremity. Another MRI of the cervical spine was performed and revealed herniated discs at C5-6 and C6-7. (R. 117.)

MRIs of Plaintiff's cervical spine performed in September 2001 and March 2003, were reportedly "essentially unchanged from the previous study." (R. 120, 179.) In March 2003, an MRI of Plaintiff's lumbar spine revealed evidence of Plaintiff's lumbar fusion but no disc protrusion, central canal stenosis, or neural foraminal stenosis at any level. (178, 180.)

In March 2004, Plaintiff was seen in the Munroe Regional Medical Center's emergency room for complaints of moderate low back and left hip pain caused by a new injury he incurred when he fell off of his roof (a distance of approximately ten feet). (R. 130.) Examination of Plaintiff was unremarkable and x-rays of his lumbar spine revealed only surgical changes at L5-S1. Plaintiff was diagnosed with a bruised back and hip. (R. 131.)

Later that month, Dr. Edward Demmi performed a consultative examination of Plaintiff at the request of the Social Security Administration. Dr. Demmi's examination of Plaintiff revealed decreased range of motion in the cervical and lumbar spine, some muscle spasms in the sacroiliac area, intact cranial nerves, reflexes and sensation, and

negative straight leg raise testing. He also observed decreased motor strength of the left ankle, knee, and great toe. (R.134-38.)

Approximately two months later, Plaintiff once again reported to the emergency room following a minor motor vehicle accident. Plaintiff presented with complaints of daily migraine headaches, neck and shoulder pain, and memory loss. (R. 203.) Dr. Lance Kim, a neurologist, examined him and noted moderate muscle spasms in Plaintiff's cervical musculature as well as some trapezius weakness but an otherwise unremarkable neurological exam. (R. 203-06.) Subsequent diagnostic testing—including MRIs of the brain and cervical spine, nerve conduction studies of Plaintiff's upper extremities, and a CT scan of Plaintiff's brain—were unremarkable. (R. 183-85, 203-11.)

Plaintiff initiated treatment at the Veteran's Administration Medical Center in November 2006 to address his complaints of low back pain radiating into his legs with a sensation of weakness. (R. 456.) According to Plaintiff, his back "started hurting again" two months prior and ibuprofen was not effective to treat his pain. Dr. Sampson's examination of Plaintiff revealed intact reflexes and motor strength. Although Plaintiff ambulated with a cane, he was able to heel toe walk. (R. 456-58.) In December 2006, Plaintiff returned with increased complaints of pain radiating into his feet. A nurse observed that Plaintiff was able to ambulate without difficulty and did not appear to be in acute pain. Examination revealed no focal motor or sensory deficits. (R. 452-53.) That same day, Plaintiff was examined by a podiatrist secondary to his complaints of foot pain. Plaintiff's best friend apparently accompanied him during the office visit and Plaintiff advised the podiatrist that they were going to drive to New Jersey for a

vacation. Examination revealed an abnormal gait but sensation was intact. An x-ray of Plaintiff's feet was normal. (R. 451-52.) X-rays of Plaintiff's lumbar spine revealed evidence of Plaintiff's lumbar fusion and "*minimal* degenerative disc disease at the L5-S1 level [with] [n]o other bony abnormalities." (R. 390) (emphasis added). Plaintiff was prescribed a cane for his abnormal gait. (R. 467.)

Dr. Urielle Delia examined Plaintiff in February 2007. Plaintiff reported with complaints of fatigue, depression, numbness in his lower extremities and pain in his back and neck; but he denied having headaches, anxiety, or incontinence problems. He had tenderness in the lumbosacral area and full range of motion in his upper and lower extremities with intact muscle strength. Neurological exam revealed no deficits in Plaintiff's reflexes or sensation and Plaintiff's cranial nerves were reportedly intact. (443-47.) X-rays of Plaintiff's lumbar spine taken in January and again in February 2007 revealed "[n]o significant interval change since previous study." (R. 388-89, 446.)

Plaintiff reportedly fell off of his roof again in March 2007 while cleaning his gutters. Despite his complaints of pain in his lower back, the examining physician observed no new neurological symptoms. (R. 434.) X-rays of his lumbar spine were unremarkable. (R. 388.)

In September 2007, Plaintiff presented to Dr. Christina Thompson, his primary care provider, with complaints of low back pain he rated a "9" out of "10" and fatigue. Neurological examination revealed normal reflexes and sensation but positive straight leg raise testing and a slow gait. (R. 426-28.) An MRI of Plaintiff's lumbar spine was

unchanged from previous studies and once again showed "no significant canal or foraminal narrowing." (R. 387.)

In December 2007, Plaintiff advised that he had recently been mugged by three men. As a result of the incident, Plaintiff complained of exacerbated back pain and "new" neck and right shoulder pain. X-rays of his cervical and lumbar spine were benign. (R. 384-86.) Between March 2007 and December 2007, Plaintiff repeatedly advised his treating physician that his pain medications were effectively controlling his pain. (R. 406, 412, 417, 424, 430-32.)

In January 2008, Dr. Donald Goldman reviewed some of Plaintiff's medical records[22] and examined Plaintiff at the request of Plaintiff's attorney. His examination of Plaintiff revealed tenderness, decreased curvature, and decreased range of motion of the lumbar spine, positive straight leg raise testing, decreased range of motion in the cervical spine, trigger point spasms in the right trapezius, and positive Lachman's and pivot shift tests[23] on Plaintiff's left knee. Based upon his review of the medical records and his examination of Plaintiff, Dr. Goldman opined that Plaintiff was capable of walking one to two blocks at a time but incapable of repetitive kneeling, bending, squatting, running, jumping, crawling, climbing, pushing, pulling, or lifting. He further

_____

[22] Dr. Goldman did not specifically list which records he reviewed, but he did explicitly address records from Dr. DiSclafani, Dr. Kim, Munroe Regional Medical Center and numerous diagnostic tests performed between 1999 and 2003. Notably, he does not mention any of Plaintiff's medical treatment from 2006 through 2008. (R. 462-64.)

[23] Both of these clinical tests are intended to check for objective signs of an anterior cruciate ligament tear.

opined that sitting for more than 25 to 30 minutes at a time would be painful for Plaintiff. (R. 460-65.)

**Medical Evidence Concerning Plaintiff's Alleged Mental Impairments**

In December 2003 correspondence with the Social Security Administration, Plaintiff complained that he was depressed and, as a result of his depression, he experienced concentration and memory problems, he was unable to follow instructions, and he was unable to deal with deadlines because he could not handle the pressure. He also stated that he did not like to be around people, did not engage in social activities, and avoided going out in public. (R. 85-86, 93-99, 129.)

Plaintiff reported to Dr. Rodney Poetter for a consultative mental status examination in March 2004 with complaints of chronic pain. Plaintiff advised that he had not sought nor received any mental health treatment in the past two years (other than anger management) and had not been on psychotropic medications since 1997. He further advised that he can read a newspaper, perform his activities of daily living independently, and watch television. Although he stated that he "gets along okay with others" he reportedly stayed to himself and did not visit anyone or attend church anymore. He was unable to grocery shop, cook, do laundry, or do housework. Dr. Poetter noted that Plaintiff arrived with a cane in his left hand and was carrying a heavy briefcase. Plaintiff maintained minimal eye contact during the examination but was able to communicate effectively. He presented with no suicidal ideations or hallucinations and his abstract thinking was intact. Examination revealed mild deficit in his immediate memory and Plaintiff "performed mental control exercises quickly and without error,

inconsistent with a severe concentration deficit." Dr. Poetter opined that there was no evidence of an underlying thought disorder and that Plaintiff's symptoms would improve with appropriate medication and treatment. (R. 127-29.)

During Dr. Demmi's consultative examination of Plaintiff later that month, Dr. Demmi observed Plaintiff to be alert and oriented with a normal mood and affect and his intellectual functioning appeared intact. (R.134-38.)

In March 2004, Dr. Alejandro Vergara, a state agency psychiatrist, reviewed Plaintiff's medical records and concluded Plaintiff did not have a severe mental impairment. He opined that Plaintiff experienced mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation. His impression was a mood disorder due to chronic pain with depressed features and noted that "disability, if any, would be physical in nature." (R. 139-52.)

After initiating treatment with the VA in November 2006, the first time Plaintiff reported any mental health complaints was in February 2007. (R. 383.) During his visit with Dr. Delia, Plaintiff reported complaints of a depressed mood and being irritable secondary to "family issues." He denied having anxiety or suicidal ideations. Dr. Delia referred him for a mental health evaluation. (R. 443-47.) Plaintiff did not thereafter seek mental health treatment until six months later.

In September 2007, Plaintiff presented to the VA for a mental health examination with complaints of depression, and memory and concentration problems. He advised that he avoids people and social situations. Plaintiff denied having suicidal ideations.

Examination revealed guarded behavior, an anxious and dysphoric mood with a constricted affect; but normal eye contact, speech, thought processes, judgment and insight. Plaintiff's memory and concentration were reportedly intact. Plaintiff's chronic pain was noted to "significantly contribute" to Plaintiff's mental health complaints. (R. 419-23.) Plaintiff returned a month later with continued complaints of depression and concentration problems. Examination revealed a depressed mood and affect but no evidence of a thought disorder. (R. 419.)

In November 2007, Plaintiff returned for a follow up visit with complaints of pain, depression and anxiety. Plaintiff advised that he lived with his best friend and his son visited him regularly. He reportedly attended his son's extracurricular activities. Examination revealed limited eye contact, dysthymic mood and affect, cooperative attitude, and normal speech with intact memory, concentration, and thought processes. Plaintiff was assigned a global assessment of functioning (GAF) score of 55. (R. 412-17.)

**Plaintiff's Testimony**

Plaintiff testified that his primary complaints are related to his back problems. (R. 512.) He experiences chronic constant pain which limits his ability to sit, stand, or walk for prolonged periods of time. Specifically, Plaintiff estimated that he was capable of walking one to two blocks with his cane, and that he could stand for five minutes at a time. (R. 547-51.) Plaintiff stated that it hurts him more to sit for prolonged periods of time than to stand. (R. 548.) In addition, Plaintiff testified that his pain interferes with his ability to sleep and that he needed to lay down intermittently during the day in an effort

to relieve his pain. (R. 547, 550.) Plaintiff is reportedly able to take care of his personal hygiene needs except that he needs help putting on his shoes and retrieving items from the cabinet due to difficulty in bending activities. (R. 550.) Plaintiff estimated that he was capable of lifting and carrying between five and ten pounds. (R. 551.)

Plaintiff also reported complaints of depression. Plaintiff testified that his mental health declined in 2007 after he experienced a lot of "personal issues" including: his son was kidnapped, his brother was murdered, and he went through a divorce. (R. 545.) Due to his feelings of having a depressed mood, he began receiving mental health treatment at the VA. As of March 2008, Plaintiff was being seen once a month for treatment of depression and not wanting to be around people. (R. 553.)

Plaintiff testified that he spends most of his time at home watching television. He drives his son to and from school. (R. 551.) He also testified that he spent time with his son by sitting and watching him play video games, and going for walks around the park. (R. 529.)

Plaintiff tried to go back to work in 2004 (he tried two different jobs) but he was unable to hold the jobs due to his back problems. (R. 512, 519.) He also attempted several different jobs in 2005 but stopped working due to back and shoulder problems. (R. 520-23.) Plaintiff worked for Stanley Steamer for a month in 2007 but left by mutual agreement with the employer because he was unable to do the job. (R. 543, 549-50.) Plaintiff testified that he was unable to keep employment due to his back problems and the physical demands of work. (R. 524-25, 534.)

Although Plaintiff has a history of a torn anterior cruciate ligament in his left knee, Plaintiff has no recent medical treatment for knee related issues. (R. 565.) Plaintiff also testified that he sometimes has difficulty controlling his bowels. (R. 550.)

**Dr. Arthur Brovender's testimony**

Dr. Arthur Brovender, an orthopedic surgeon, was called to testify as a Medical Expert (ME) at the administrative hearing which took place in March 2008. Because Plaintiff's attorney did not provide the ALJ with a copy of Dr. Goldman's report in time for a copy to be given to the ME, the ALJ temporarily suspended the hearing so that a copy of the report could be faxed to Dr. Brovender for his review. (R. 554-56.)

As part of his testimony, Dr. Brovender summarized objective medical findings he found within the medical records he reviewed at the ALJ's request. (R. 559-61.) Dr. Brovender testified that he was unable to render an opinion to the extent Plaintiff was alleging incontinence because he did not see any medical evidence that Plaintiff's back problems were causing incontinence and also because Dr. Brovender is not a urologist. He testified that he believed Plaintiff's orthopedic problems caused him to experience pain, but based upon his review of the medical evidence that was provided to him, Plaintiff's testimony at the hearing, as well as his extensive experience as an orthopedic surgeon, Dr. Brovender opined that notwithstanding Plaintiff's pain, Plaintiff was capable of lifting 20 pounds occasionally, ten pounds frequently, sitting for six to eight hours, standing for four hours (with breaks), and incapable of crouching, crawling, kneeling, or climbing ladders and/or scaffolds. (R. 558-59, 563-64.) When asked whether Plaintiff met or equalled any of the Listings, Dr. Brovender opined that Plaintiff does not meet or

equal Listing 1.04. (R. 563-64.) In rendering this opinion, Dr. Brovender referred to Dr. Goldman's report and noted that Dr. Goldman's report "says that the sciatic nerve is caught in a fusion. The sciatic nerve is no where near. . . [it] is in your buttocks. . . the lower lumbar nerve roots form a joint by the sciatic nerve." Dr. Brovender also noted that although Dr. Goldman observed positive straight leg raise testing results and Plaintiff had limited range of motion, Plaintiff had no sensory or reflex loss. (R. 563-64.)

## IV. **DISCUSSION**

Plaintiff raises two issues in his appeal. The Plaintiff argues that the ALJ improperly concluded that Plaintiff does not suffer from a severe mental impairment at step two of the sequential analysis. Plaintiff also argues that the ALJ improperly discounted the opinion of consultative examining physician in favor of the opinion rendered by a non-examining medical expert who testified at the hearing.

**A.      Substantial Evidence Supports the ALJ's Determination that Plaintiff Does Not Suffer from a Severe Mental Impairment.**

For a medical condition to be considered "severe," it must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[24] Thus, a diagnosis of "dysthymia with anxious features" does not necessarily compel the conclusion that the condition is disabling.[25] Although the threshold for meeting the definition of a "severe impairment" at step two is low, the burden is on the Plaintiff to

---

[24] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[25] 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

provide evidence demonstrating the disabling impact of his mental impairments.[26] In the absence of evidence of functional limitations attributable to the condition, a diagnosis of a condition is insufficient to support a finding of a severe impairment.[27]

Plaintiff challenges the ALJ's determination at step two of the sequential analysis that Plaintiff does not suffer from a severe mental impairment arguing that the ALJ improperly discounted the opinions of examining and treating physicians in favor of a non-examining state agency physician. In support of his argument, Plaintiff points to an October 2007 treatment note purportedly from his treating mental health care provider, Dr. Hodgins,[28] in which Plaintiff was assigned a global assessment of functioning (GAF) score of 55.[29] According to Plaintiff, the medical evidence concerning his GAF score demonstrates that Plaintiff's mental impairments caused moderate limitations in social and/or occupational functioning. However, the Social Security Administration has expressly declined to endorse the use of the GAF scale in determining the severity of mental disorders.[30] Thus, standing alone, the GAF score is insufficient evidence to

---

[26] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[27] Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005); *see also* McCruter, 791 F.2d at 1547 ("[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").

[28] In fact, the treatment note was generated by a licensed clinical social worker. In any case, although the opinion is not entitled to deference under the treating physician rule, Social Security regulations permitted the ALJ to consider the social worker's findings in determining the severity of Plaintiff's impairments. *See* 20 C.F.R. § 404.1513(a).

[29] A person whose score falls between 51 and 60 is described as having "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th ed. 2000).

[30] Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000).

satisfy Plaintiff's burden of demonstrating the disabling impact of his mental impairments.

The clinical findings which accompany Plaintiff's GAF score of 55 show that Plaintiff's condition caused no more than mild limitations at the time of the examination. Although the treatment note acknowledged Plaintiff's depressed mood and affect and noted Plaintiff's limited eye contact during the examination, the examiner also observed that Plaintiff's speech was normal, his thought processes were intact, and there were no deficits in concentration and/or his memory. Such findings are consistent with the ALJ's determination that Plaintiff's mental impairments did not significantly limit his ability to perform basic work activities.[31]

Plaintiff also points to the report of Dr. Rodney Poetter, a consultative examining physician, arguing that the ALJ's discussion of Dr. Poetter's findings in his decision was incomplete. To the extent Plaintiff is arguing that the ALJ erred merely because she failed to discuss every item of evidence in the record, the argument lacks merit. An ALJ is not required to summarize the entire record before her in her written decision where the unmentioned medical evidence supports the ALJ's conclusion.[32] Furthermore, none

---

[31] Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28.

[32] See Cunningham v. Shalala, 880 F. Supp. 537, 551 (N.D. Ill.1995) ("[I]t is not incumbent upon the [ALJ] to specifically comment upon every bit of evidence in the record."). Cf. Nyberg v. Comm'r of Soc. Sec., No. 05-16286, 2006 WL 1168815, at *3 (11th Cir. May 2, 2006) (ALJ erred in failing to mention a physician's opinion in his written decision where the opinion contradicted the ALJ's findings); Krueger v. Astrue, No. 2:06-cv-465-FtM-29SPC, 2008 WL 596780, at *11(M.D. Fla. Feb. 29, 2008) (ALJ's failure to address contradictory treating physician's opinion was reversible error).

of the findings in Dr. Poetter's report are inconsistent with the ALJ's assessment of Plaintiff's mental problems. As noted by the ALJ in her decision, Dr. Poetter's examination of Plaintiff revealed "only mild deficits in immediate memory and no severe deficits in concentration . . . [nor evidence of an] underlying thought disorder." (R. 23.) The ALJ does not specifically discuss Dr. Poetter's additional findings that Plaintiff made minimal eye contact, showed restricted emotional range, and correctly answered three out of four structured questions which are designed to gauge judgment and common sense reasoning skills. Nonetheless, the ALJ's omission of these findings from her written decision is not error. Contrary to Plaintiff's contention that the ALJ's summary of Dr. Poetter's report "unjustly distorted the import of [Dr. Poetter's] findings," the ALJ merely highlighted the portions of the report she found to be relevant to her assessment of Plaintiff's mental condition. Dr. Poetter's report, when viewed in its entirety, is consistent with the ALJ's determination that Plaintiff has only mild limitations in his activities of daily living, mild restriction in his social functioning and mild limitation in his ability to maintain concentration, persistence, and pace with no episodes of decompensation.

Further supporting the ALJ's assessment is the fact that Plaintiff consistently reported that he is capable of independently performing his activities of daily living. Although Plaintiff complained that he does not like to be around people, the evidence of record shows that he spends a significant amount of time with his best friend and his son. Notably, Plaintiff testified that he worked in 2004 and 2005 and, according to Plaintiff, he stopped working because he was physically incapable of doing the work

asked of him. He did not testify to having any work related limitations during those time periods attributable to his mental impairment. In sum, although there is evidence that Plaintiff does experience depression and anxiety symptoms, there is simply no evidence demonstrating that these conditions caused severe functional limitations.

**B.    The ALJ Properly Weighed the Opinion of Dr. Goldman.**

In the Eleventh Circuit, substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a treating physician absent a showing of "good cause" to the contrary.[33] However, the opinion of a consultative examining physician is not owed the same level of deference.[34] In fact, as set forth in the Social Security Administration's regulations, an ALJ must consider several factors when determining what weight, if any, to give to the opinion of an "acceptable medical source."[35] These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[36]

---

[33] Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997) ("'[G]ood cause' . . . exist[s] where the doctor's opinion [is] not bolstered by the evidence, or where the evidence support[s] a contrary finding" and also where "the doctors' opinions [are] conclusory or inconsistent with their own medical records") (internal citations omitted); *see also* 20 C.F.R. § 404.1527(d) (describing the manner in which the ALJ is to evaluate medical evidence); O'Neal v. Astrue, 5:07-cv-143-Oc-10GRJ, 2008 WL 2439885, at *3 (M.D. Fla. June 13, 2008).

[34] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

[35] 20 C.F.R. § 404.1527(d).

[36] Id.

Plaintiff argues that the ALJ improperly discounted the opinion of Dr. Goldman and instead relied on the opinion of Dr. Brovender, the non-examining physician who testified at the administrative hearing. According to Plaintiff, the ALJ should have given more weight to Dr. Goldman's report because, unlike Dr. Brovender, he had the benefit of examining Plaintiff. However, because neither Dr. Goldman nor Dr. Brovender are treating physicians, the fact that Dr. Goldman actually examined Plaintiff is merely one of several factors the ALJ was obligated to consider. Accordingly, the ALJ was entitled to assign more or less weight based upon the application of the aforementioned factors.

Both Dr. Goldman and Dr. Brovender are orthopedic specialists who are familiar with the disability determination process. Although Dr. Goldman had the benefit of examining Plaintiff, weighing all of the factors, the ALJ concluded that Dr. Brovender's opinion was better supported by the medical evidence of record and more consistent with the record as a whole. Substantial evidence supports this conclusion.

In support of his argument, Plaintiff attempts to paint Dr. Brovender's testimony as unreliable due to perceived factual inaccuracies within the medical expert's testimony. For example, Plaintiff challenges Dr. Brovender's testimony concerning the location of the sciatic nerve. Dr. Brovender testified that the sciatic nerve is "no where near" the L5-S1 level of the spine. According to Plaintiff, "the sciatic nerve does, in fact, emerge from the spinal cord at the lower levels of the lumbar spine" citing an article from Encyclopedia Britannica as authority for this proposition.[37] Plaintiff has presented

---

[37] Although Plaintiff also cites to an online medical library's definition of sciatica, this evidence is equally unhelpful as the definition of "sciatica" does not identify the anatomical location of the sciatic nerve.

no credible evidence to refute the expert's testimony or to show any error by the ALJ on this point. According to the Plaintiff, this isolated section of text from a general reference tool—which is not even a medical text or treatise—has more weight and should trump the testimony and opinion of a medical expert who has been practicing medicine in the field of orthopedic surgery for over forty years.

Plaintiff also disputes Dr. Brovender's testimony that there was no evidence of reflex loss or muscle weakness apart from one report of weakness in Plaintiff's big toe. Plaintiff argues that clinical findings made by Dr. Demmi, Dr. Goldman, Dr. Kim, and Dr. Sampson disprove Dr. Brovender's characterization of the medical evidence. For the reasons that follow, Plaintiff's argument lacks merit.

First, Dr. Brovender expressly stated that his opinion was based upon his review of the medical evidence that was provided to him, Plaintiff's testimony at the hearing, as well as his extensive experience as an orthopedic surgeon. (R. 558-59.) Although Dr. Demmi's examination of Plaintiff did reveal decreased motor strength of the left ankle, knee, and great toe, Dr. Demmi's report was not provided to Dr. Brovender.[38]

Next, Plaintiff points to a treatment note from Dr. Kim in which Dr. Kim observes muscle weakness in Plaintiff's right trapezius muscle. However, the trapezius muscles are located in Plaintiff's upper torso and Plaintiff fails to explain how clinical findings concerning Plaintiff's upper body in any way contradicts Dr. Brovender's testimony concerning Plaintiff's lower back condition.

---

[38] The report from Dr. Demmi's March 2004 consultative examination of Plaintiff is labeled "Exhibit B6F." (R. 134-38.) According to the ALJ, she provided Dr. Brovender with copies of Exhibits B1F, B2F, B4F, B5F, B8F, B11F, B13F, B14F, B16F, B18F, B20F, B22F and a substantial portion of B21F. (R. 559.)

Plaintiff also highlights the portion of Dr. Sampson's November 2006 treatment note in which the physician notes Plaintiff's subjective complaint that he was experiencing sharp piercing pain radiating down his legs "with some weakness." (R. 456.) However, Plaintiff omits the portion of that same treatment note in which Dr. Sampson's physical examination revealed Plaintiff was capable of heel and toe walking,[39] his motor strength was "okay," and his reflexes were bilateral and symmetrical. (R. 457.) Lastly, Dr. Brovender acknowledged Dr. Goldman's clinical findings (and corresponding opinion), but opined that it was unsupported by the medical evidence as a whole.

Contrary to Plaintiff's assertion that the ALJ gave "controlling weight" to Dr. Brovender's opinion, the ALJ acknowledged the functional limitations outlined in Dr. Goldman's report but gave greater weight to the opinion of Dr. Brovender because she found Dr. Brovender's opinion to be better supported by the medical evidence as a whole. Indeed, it is not apparent whether Dr. Goldman reviewed any of Plaintiff's more recent medical records.[40]

Neurological examinations of Plaintiff between 2004 and 2007 were largely unremarkable with Plaintiff demonstrating no reflex or sensory deficits and intact motor strength. Diagnostic testing concerning Plaintiff's lumbar spine from 2003 through 2007

---

[39] The ability to heel and toe walk is inconsistent with muscle weakness in the lower extremities. *See* Merck Manuals Online Medical Dictionary, Physical Examination: Diagnosis of Brain, Spinal Cord, & Nerve Disorders, Motor and Sensory Nerves, http://www.merck.com/mmhe/sec06/ch077/ch077c.html.

[40] Dr. Goldman's summary of the medical evidence he reviewed as part of his evaluation of Plaintiff did not discuss records from the VA nor did he mention diagnostic test results from 2006 and 2007. (R. 462-64.)

revealed minimal degenerative disc disease at the L5-S1 level and no evidence of disc herniation. (R. 131, 178-80, 211-16, 384-89, 446.) Between March 2007 and December 2007, Plaintiff advised his treating physician on nine different occasions that his pain medications were effectively controlling his pain. (R. 406, 412, 417, 424, 430-32.) In addition, Plaintiff's reported activities are inconsistent with a those of a person with disabling back pain. For example, although Plaintiff complained that his pain prevented him from being able to do any housework, he was seen in the emergency room in March 2004 and again in March 2007 for treatment of low back pain after he fell off of his roof while cleaning his gutters. (R. 130, 434, 437.) Contrary to Plaintiff's complaints of being unable to sit for prolonged periods of time, in December 2006, Plaintiff advised his physician that he and his best friend planned to drive to New Jersey for a vacation. (R. 451-52.) Plaintiff testified that he has suffered from chronic and constant back pain since his first injury in the early 1990s, but his treating physician noted that Plaintiff reported that his back "started hurting again two months" prior to the office visit. (R. 456-58.)

The ALJ may discount or reject any medical opinion to the extent the evidence supports a contrary finding so long as the ALJ states the weight given to the different medical opinions and the reasons therefore.[41] The ALJ's decision not to fully credit Dr. Goldman's findings as to Plaintiff's ability to perform work-related physical activities was both thoroughly explained and well supported by substantial evidence as set forth above.

---

[41] Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1986).

## V. **CONCLUSION**

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The

Clerk is directed to enter final judgment in favor of the Commissioner consistent with

this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 17, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel